UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ONEBEACON INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-3061 |
| | § | |
| T. WADE WELCH & ASSOCIATES, et al., | § | |
| | § | |
| Defendants. | § | |

ORDER

Pending before the court are (1) a motion for summary judgment filed by plaintiff OneBeacon

Insurance Company ("OneBeacon") (Dkt. 237); and (2) a joint motion for partial summary judgment

as to the fourth cause of action filed by defendants T. Wade Welch and T. Wade Welch and

Associates (the "Welch Firm") (collectively, the "Welch Litigants") and intervenor DISH Network

Corporation ("DISH") (Dkt. 238).  Having considered the motions, other relevant materials in the

record, and the applicable law, the court finds that both motions, as they relate to the prior

knowledge exclusion, should be DENIED.[1]

I. BACKGROUND

This is an insurance dispute in which the insurer, OneBeacon, filed a claim seeking a

declaration that the insurance policies at issue are void ab initio or that it otherwise has no obligation

under the policies.  Dkt. 52.  The Welch Litigants purchased the policies at issue.  The Welch

Litigants filed an answer and counterclaims in which they assert claims for breach of contract, breach

---

[1]  This order addresses only whether summary judgment should be granted to either party
with respect to the prior knowledge exclusion.  The other issues raised in OneBeacon's motion for
summary judgment will be addressed in another order or orders.

of the common law duty of good faith and fair dealing, unfair insurance practices in violation of the Texas Insurance Code, noncompliance with the Texas Prompt Payment of Claims statutes, negligence and gross negligence with regard to OneBeacon's duty as a reasonably prudent insurer, and violations of the Texas Deceptive Trade Practices Act.  Dkt. 193-1.

In or around 2003, the Welch Firm was hired to defend DISH against Russian Media Group in *Russia Media Group, LLC v. EchoStar Communications Corporation and Kelly Broadcasting Systems, Inc.*, No. 03-cv-1263-WWE (D. Conn.) (the "RMG Litigation").  Dkt. 246.  Defendant Ross Wooten served as the attorney from the Welch Firm.  He represented DISH in the RMG Litigation from approximately 2005 through 2008.  Dkt. 246-2 (Wooten Decl.).  In August or September 2005, RMG served discovery on DISH.  Dkt. 246-5 (Golub Dep.) at 18.  Wooten did not respond to the discovery requests within 30 days.  He states that he believed RMG had agreed orally to extend the deadlines.  Dkt. 246-4 (Wooten Dep.) at 208-09.  On December 6, 2005, RMG filed a motion to compel Wooten to respond.  Dkt. 246.  Wooten did not file a response to that motion.  Dkt. 246-4 at 216.  He asserts that he "believe[s] there was a telephone hearing, perhaps, with the Court. Something precluded us from needing to file a response." *Id.*  RMG's counsel, David Golub, recalls that the judge did not want to litigate a discovery order motion and that Wooten told the judge he would get the discovery to Golub.  Dkt. 246-5 at 39-40.  This occurred on December 28, 2005. *Id.* at 38.

On February 23, 2006, the court entered a discovery order that required DISH to respond to all of RMG's requests by March 16, 2006.  Dkt. 237-19 (2006 discovery order).  The order outlined consequences for failing to timely comply, which included deeming the claims at issue established

and the defenses precluded ("death penalty sanctions").[2]  *Id.*  Wooten consented to submitting the responses within this timeframe.  Dkt. 237-17.  Wooten intended to comply with this order when it was entered.  Dkt. 246-4 at 230.  Wooten filed responses on March 16, 2006, but did not produce documents at that time.  Dkt. 246-7 (Golub Aff. (Feb. 18, 2007)).  He had called Golub and requested a few additional days to send the documents, and Golub consented to the additional days.  Dkt. 246-7 at 2 n.3.  Wooten produced some documents during the week of March 20, 2006.  *Id.* at 2-3.  Wooten claims that he then "went about the rest of 2006 and [his] other dealings with Russian Media Group thinking that [he] had complied."  Dkt. 246-4 at 230.  However, the responses were not signed under oath as required by the Federal Rules of Civil Procedure, and Wooten did not identify the documents responsive to requests for production even though the responses stated he would update and provide Bates numbers.  Dkt. 237-21; *see* Fed. R. Civ. P. 33(b)(3)

In August 2006, Golub sent Wooten an email stating, that he was writing, "as a courtesy, to let [Wooten] know that unless compliance with RMG's discovery requests and interrogatories, as ordered by Judge Eginton, is completed by September 1, 2006, plaintiff will seek appropriate relief."  Dkt. 246-8 (Aug. 22, 2006 email from Golub to Wooten).  Wooten spoke to Golub on the telephone and assured him that he would send more documents.  Dkt. 246-7.  On September 5, 2006, Wooten provided more than 500 additional pages of documents.  Dkt. 246-5 (Golub Dep.) at 130-31.  Golub did not write Wooten after this supplemental production to complain about noncompliance with the February 23, 2006 order.  *Id.* at 131.

---

[2]  Specifically, the court "ORDERED that, if either defendant fails to answer and respond fully to plaintiff's interrogatories and document requests as ordered . . . , orders deeming the claims at issue in any unanswered discovery established and further precluding defendants from disputing plaintiff's evidence as to any such claims; and further deeming the defenses asserted by defendants at issue in any unanswered discovery precluded."  Dkt. 237-19 (2006 discovery order).

On November 20, 2006, T. Wade Welch completed an application for insurance with Westport Insurance Company. Dkt. 238-13. Welch answered "no" to the following question on the Westport application:

> After inquiry of each lawyer, is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of any fact or circumstance, act, error, omission, or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability?

*Id.* This application also set forth the following prior-knowledge exclusion: "All claims will be excluded that result from any acts, circumstances or situations known prior to the inception of coverage being applied for, that could reasonably be expected to result in a claim." *Id.*

On December 20, 2006, Welch represented to OneBeacon that the statements made in the November 20, 2006 Westport application would be deemed made to OneBeacon and that all statements were true as of December 20, 2006. Dkt. 238-14. He also stated that

> the Insured, after inquiry of all officers and managers, is not aware of any claims against the Insured or circumstances, Incidents, disputes or fee problems that may give rise to a claim against the Insured, other than those disclosed in the application . . . .

*Id.* OneBeacon issued Policy No. 090-06 to the Welch Firm for the period of December 20, 2006 through December 20, 2007. Dkt. 237-1.

In February 2007, Golub filed a motion seeking discovery sanctions due to Wooten's "blatant failure to respond fully and properly to [RMG's] discovery requests." Dkt. 237-23. This motion was based, in part, on the order entered in 2006, which called for the entry of death penalty sanctions if Wooten failed to comply with the order. *Id.* Wooten did not call Golub to attempt to work out the deficiencies after this motion was filed. Dkt. 238-8 at 34 (transcript of hearing on February 2007 motion). He also did not offer an adequate explanation at the hearing of the sanctions motion on July

4

12, 2007.[3]  Dkts. 238-7, 238-8.  The court granted the February 2007 motion on July 20, 2007,

finding that DISH had failed to comply with the February 2006 order.  Dkt. 237-20. The court

ordered the following sanctions for DISH's failure to adequately respond to discovery: (1) RMG's

claims were established; (2) DISH was precluded from disputing RMG's evidence; and (3) DISH

---

[3]  During the hearing on the February 2007 motion, Wooten stated that after the original discovery requests were served, he and Golub were engaging in settlement discussions. Dkt. 238-8 at 22.  "Neither Mr. Golub nor myself wanted to waste money on discovery, if we were gonna go down a track to where we could settle the case." *Id.* at 22-23.  As far as the discovery order, Wooten stated that he agreed to it because he "was then planning on responding to the discovery." *Id.* at 23. Golub had pointed out in the motion that Wooten had missed a section of files in the production, and Wooten stated during the hearing: "He never told me about that, but once I did find out, then I went back, and I realized where I had missed a section of files from one department . . . . So we produced that." *Id.* at 24-25.  Wooten stated that he and Golub did not have any conversations specifically about discovery between the time that he produced the documents and an email Golub sent in September but that when he received Golub's email, he responded that the "e-mail is vague, but I'm happy to look at anything." *Id.*  Wooten stated, "All of these complaints that he comes in here and he talks about how there were so crucial, and they were so important, I don't hear any of it until he files his motion in February, and I'm not saying that he has to negotiate, I'm just simply saying that, you know, before you're gonna file this type of motion, you should at least attempt to meet and confer with the other side.  You know, if I'm such a bad guy, and I'm not gonna produce anything, then what does it hurt to call me and say, 'I have a complaint about (a), (b), (c), and (d),' and that way – because I – he understands this case a lot better than I do, and granted, there are some things that maybe I messed up.  There was – and I – there was one instance, and I didn't realize it *until he filed his motion.*" *Id.* at 28-29 (emphasis added).  Wooten went on: "It doesn't even have to be a long letter . . . . Just call and list the issues, and now we can address them, instead of just going radio silent on discovery for eleven months, and the first time I see any specific complaint is in that motion, and then I hear a few more today, which are the first time that I'm hearing today, that, you know, if it could have been discussed, we probably could have worked it out, and not be here in front of you." *Id.* at 29-30.  Wooten asserted that the motion should be denied because RMG "did not meet and confer [with him] on any issue." *Id.* at 30.  The Judge chastised Wooten because the motion was filed in February and the hearing was not until July, and it "seem[ed] to [her] that [it was] incumbent on [Wooten] to do something about it right away, like in February, not to come in here and say, 'Well, we could answer that question,' or 'Maybe we could do this' . . . ." *Id.* at 33. Wooten responded that he went back to the client when he got the motion and investigated the things about which Golub was complaining and produced documents. *Id.*  Wooten, however, did not call Golub to confirm if it was what Golub needed. *Id.* at 34.  During the hearing, Golub also noted that he "was flabbergasted when [he] did not get a phone call and a response in February or March of 2007, and the idea – and this, I just think it has to be corrected." *Id.* at 35.

was liable for the fees and costs incurred by RMG in pursuing the discovery orders. *Id.* The court stated that Wooten had offered no reasonable explanation for failing to comply with the February 2006 order. *Id.*

On December 6, 2007, Welch completed another application for insurance with OneBeacon. This application indicated that Welch "must report any known claim, suit, or incident, act, or omission that may in the future give rise to a claim or suit, to your current professional liability insurer before the claims-reporting period under that policy expires." Dkt. 238, Ex. 10. Welch answered the following question "no": "Are you or any members or employees of your firm aware of any fact, circumstance, or situation which might reasonably be expected to give rise to a claim?" *Id.* OneBeacon issued Lawyers Professional Liability Policy No. LAP-0978-07 to the Welch Firm for the period of December 20, 2007 through December 20, 2008 (the "2007 Policy"). Dkt. 237-29.

DISH claims that in "the face of the preclusive effect of the Sanctions Order [issued in 2007], and the over $100 million in damages that RMG intended to seek at trial, [DISH was] compelled to settle the RMG Lawsuit." Dkt. 237-13 ¶ 21. In August 2011 DISH agreed to settle the RMG Litigation by paying $12,000,000.00 to RMG. *Id.*

On or about February 1, 2012, DISH filed a demand for arbitration that alleged professional malpractice against the Welch Firm in connection with its handling of the RMG Litigation. Dkt. 237-26. On June 1, 2012, DISH filed an amended demand. Dkt. 237-13. On April 17, 2013, the arbitrator issued an award in favor of DISH. Dkt. 237-27. The arbitrator found that Wooten, in response to the March 2006 discovery order, "prepared and served unverified interrogatory responses of little substance and produced more than 4,000 pages of documents." *Id.* The arbitrator noted that for the next six months, "little or no litigation activity was taking place" and that RMG advised Wooten in August 2006 that the March responses were "inadequate and incomplete." *Id.* The

6

arbitrator stated that Wooten provided at least 500 more pages of documents, "but did not verify his prior interrogatory responses or offer identifying Bates reference numbers for any documents produced." *Id.* The next action noted by the arbitrator is the February 2007 motion for sanctions filed by RMG. *Id.* A district court in Harris County, Texas, confirmed the arbitration award on June 17, 2013. Dkt. 237-28.

The Welch Firm advised OneBeacon that DISH had a potential claim relating to the RMG Litigation in April 2008. Dkt. 193-1. It became an official "claim" at some point in 2010. *Id.* OneBeacon filed this lawsuit on August 22, 2011. Dkt. 1. OneBeacon now seeks summary judgment on its claim that the prior knowledge exclusion and the terms and conditions of the 2007 Policy preclude any coverage for the Welch Litigants. Dkt. 237. DISH and the Welch Litigants have filed a cross motion seeking summary judgment in favor of the Welch Litigants on the same issue. Dkt. 238-1.

## II. LEGAL STANDARD

### A.  Summary Judgment

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). Upon a defendant's motion for summary judgment, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S. Ct. 1348 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence

supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B. Contract Interpretation

"Texas courts interpret insurance policies according to the rules of contract construction." *de Laurentis v. U.S. Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The primary objective of the court is to ascertain the parties' intent, as expressed in the written instrument. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). "[T]he parties' intent is governed by what they said, not by what they *intended* to say but did not." *Nautilus Ins. Co. v. Country Oaks Apartments, Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009) (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)) (internal quotation omitted).

If an insurance policy is worded so that it can be given a definite meaning or certain legal meaning, then the policy is not ambiguous and is construed by the court as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). An ambiguity exists where a policy is susceptible to more than one meaning. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Courts interpreting contractual provisions give terms their plain, ordinary, and generally accepted meanings, unless otherwise defined by the parties. "'Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient

to *create* an ambiguity.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. U.S. Liquids, Inc.*, 271 F. Supp. 2d 926, 932 (S.D. Tex. 2003) (quoting *Forbau*, 876 S.W.2d at 134). "[I]f, and only if, the court finds an ambiguity in the contract provisions, particularly in exclusionary clauses, the court should construe the policy strictly against the insurer." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 271 F. Supp. 2d at 932; *see also Waffle House, Inc. v. Travelers Indem. Co. of Ill.*, 114 S.W.3d 601, 607 (Tex. App.—Ft. Worth 2003, pet. denied) (cautioning that exclusionary provisions "must be clearly expressed and must not be ambiguously worded"). And, "if the insured's construction of an exclusionary provision is reasonable, it must be adopted, even if the insurer's construction is more reasonable." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 271 F. Supp. 2d at 931.

Under Texas law, an insured has the burden of establishing coverage under the terms of an insurance policy. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). If the insured proves coverage, then to avoid liability the insurer must prove that the loss is within an exclusion. *Id*. If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage. *Id*.

## III. ANALYSIS

OneBeacon moves for summary judgment on its claim that the prior knowledge exclusion in the 2007 Policy excludes coverage of the Welch Litigants' claims. Dkt. 237. DISH and the Welch Litigants filed a cross motion on the same claim asserting that the prior knowledge exclusion cannot apply as a matter of law because wrongful acts occurring after the inception of the 2007 Policy gave rise to DISH's claim. Dkt. 238-1. DISH and the Welch Litigants also argue that even if the claim could possibly be subject to the prior knowledge exclusion, the court should interpret

the 2007 Policy to exclude only the wrongful acts that the insured could reasonably have foreseen

might result in a claim or suit for professional liability.  *Id.*

## A.    The Application and Policy

The exclusion at issue states:

This policy does not apply to:

> A.    any **claim** arising out of a **wrongful act** occurring prior to the **policy period** if, prior to the effective date of the first Lawyers' Professional Liability Insurance Policy issued by **us** to the **named insured** and continuously renewed and maintained in effect to the inception of this **policy period**:
> . . .
> 2.    **you** had a reasonable basis to believe that **you** had committed a **wrongful act**, violated a disciplinary rule, or engaged in professional misconduct; [or]
> 3.    **you** could foresee that a claim would be made against **you** . . . .

Dkt. 238-4 ¶ VII.  A "claim" is

> 1.    a demand received by **you** for money or services, including the service of a lawsuit or institution of arbitration proceedings or filing or any other **claim** against **you**, alleging a **wrongful act** as defined in this policy;
> 2.    a written request received by **you** to toll or waive a statute of limitations relating to a **potential claim**; or
> 3.    a **disciplinary proceeding**.

*Id.* ¶ V.B.  A "wrongful act" is

> any actual or alleged act, error, omission or breach of duty arising out of the rendering or the failure to render **professional legal services**. **Wrongful act** also means **personal injury** arising out of **your** conduct relating to the delivery of **professional legal services**.

*Id.* ¶ V.O.

Wrongful acts are also referred to in the Conditions of the 2007 Policy.  Paragraph X.H.,

entitled "Multiple Insureds, Claims or Claimants" states:

> Each **wrongful act**, in a series of related **wrongful acts**, will be deemed to have occurred on the date of the first such **wrongful act**. A series of related **wrongful acts** includes **wrongful acts** which are logically or causally connected by common facts, circumstances, situations, events, transactions or decisions and which may involve the same person or organization or class of persons or organizations. . . .

*Id.* ¶ X.H.

The application for the 2007 Policy includes a section the insured must complete regarding "prior insurance and claim history."  Question 38 of that section asks:

> Are you or any members or employees of your firm aware of any fact, circumstance, or situation which might reasonably be expected to give rise to a claim? *(If yes, complete a Claim Supplement for each claim or suit.)*

Dkt. 238-12 at 5.  There is also an "important note" under this section:

> You must report any known claim, suit, or incident, act, or omission that may in the future give rise to a claim or suit, to your current professional liability insurer before the claims-reporting period under that policy expires.

*Id.*

**B.    "Wrongful Acts"**

The first stop in determining whether the prior knowledge exclusion applies is the actual text of the exclusion.  The exclusion applies only if one of four conditions apply, and the parties rely primarily on condition 2: "**you** had a reasonable basis to believe that **you** had committed a **wrongful act**, violated a disciplinary rule, or engaged in professional misconduct."  It is not difficult to determine that condition 2 is met in this case.  Wooten violated a disciplinary rule or engaged in professional misconduct.  Among other things, Wooten agreed to the order regarding sanctions if he did not adequately respond to discovery in February 2006, and he did not inform his client about

the pending motion or the entry of the order.  Dkt. 237, Ex. 11 at 4 (DISH demand for arbitration).

Under Connecticut Rules of Professional Conduct, Wooten had a duty to keep his client reasonably

informed.  *See* Conn. Rules of Prof'l Conduct R. 1.2, R. 1.4.

After determining that the second condition is met, one must look at the main text of the

exclusion, which applies only to claims "arising out of a **wrongful act** occurring prior to the **policy**

**period**."  So while Wooten indisputably violated a disciplinary rule or engaged in professional

misconduct prior to the policy period, did he commit a **wrongful act** from which the **claim** arose?

In order to answer this question, one must look at the definition of "wrongful act."  This

definition includes "any actual or alleged act, error, omission or breach of duty arising out of the

rendering or the failure to render **professional legal services**."  Since both series of objects in this

definition are separated by the article "or," the definition can be read as "any actual or alleged act

. . . arising out of the rendering [of] professional legal services."  The plain language of the definition

thus indicates that essentially any action a lawyer takes is a "wrongful act."

The Welch Litigants and DISH assert that the definition of "wrongful act" as drafted is

ambiguous and, if read as written, would render the policy's retroactive coverage wholly illusory.

Dkt. 273.  The Welch Firm paid for retroactive coverage that would apply to claims made during the

policy period that were "caused by a **wrongful act** which [took] place before or during the **policy**

**period** and after [January 4, 1995]."  Dkt. 273-2 at 2.  If any act of rendering legal services is a

"wrongful act," then there would be almost no circumstance where a claim based on pre-policy

actions would be covered.  The Welch Litigants and DISH note that retroactive coverage was

specifically negotiated by the parties and, if the term "wrongful act" were interpreted according to

a plain-language reading, the Welch Firm would receive nothing for the increased premiums they

paid for the retroactive coverage.  Dkt. 273.  They thus urge the court to construe the definition in

conjunction with what the policy applications, which were incorporated into the policy, indicate should be disclosed—prior errors, omissions and breaches of duty that an insured should have reasonably believed, at policy inception, would lead to a malpractice claim.  *Id.*

OneBeacon argues that the definition of "wrongful act" is not ambiguous because (1) there is no need to reiterate the term "wrongful" prior to "act" in the definition of "wrongful act"; and (2) the principle of construction, *noscitur a sociis*, requires a construction of "any actual or alleged act" that is consistent with the other events referred to in the remainder of the definition of "wrongful act"—"error, omission, or breach of duty."  Dkt. 271.  Since "error, omission, or breach of duty" all refer to mistakes or improper conduct, the word "act" must also refer to improper conduct and not to everyday acts of attorneys rendering legal services.  *Id.*  OneBeacon also points out that the court should interpret the contract in the context of the facts of this case and not some hypothetical scenario and insists that, under the facts of this case, it is undisputable that Wooten committed a wrongful act prior to the policy period that he knew could give rise to a claim.[4]  *Id.*

OneBeacon's first argument, that the court should just construe the term "act" as meaning a "wrongful act" rather than requiring the term "wrongful" to be reiterated, is nonsensical.  If a "wrongful act" were defined as a "wrongful act," then there would be no need to even define it.

---

[4] OneBeacon additionally asserts that even if the first part of section VII.A.2 is determined to be overly broad because it relies on the definition of "wrongful act," that portion of VII.A.2 can simply be ignored because the other subparts—violating a disciplinary rule or engaging in professional misconduct—do not depend on the definition of "wrongful act," and Wooten violated multiple disciplinary rules and engaged in professional misconduct, including violating six of Connecticut's Rules of Professional Conduct.  Dkt. 271 at 8–9.  The court has already noted that condition 2 is met even without delving into whether Wooten committed a "wrongful act"; the issue is whether the main text of the exclusion, which only excludes claims arising out of a "**wrongful act**," is met.

The second argument has more merit.  The traditional canon of construction *noscitur a sociis* means "a word is known by the company it keeps." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 750–51 (Tex. 2006).  The purpose of this rule is "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words."  *Gustafson v. Alloyd Co., Inc.* 513 U.S. 561, 575, 115 S. Ct. 1061 (1995).  In *Gustafson*, the U.S. Supreme Court used *noscitur a sociis* to interpret the term "communication" in § 2(10) of the Securities Act of 1933 as referring only to "public communication" because it was contained in a list of terms that refer to documents in wide dissemination.  *Id.*  In *Fiess*, the Texas Supreme Court used *nosictur a sociis* to interprete the term "water damage" in an ensuing-loss clause of an insurance policy that contained the list "building collapse, glass breakage, or water damage" as referring "to something more substantial than every tiny water leak or seep."  *Feiss*, 202 S.W.3d at 751.  The court determined that "water damage" could not refer to "common maintenance items" and that the policy exclusion for "mold" thus could not be disregarded by deeming all mold to be "water damage."  *Id.*  Here, the court applies the *noscitur a sociis* to draw the logical conclusion that the term "act" in the definition of "wrongful act" cannot mean *any act* by an attorney, as it is contained in a list that refers to mistakes or some type of improper conduct.[5]

## C.    "Arising out of"

The court now turns to whether the claim arose out of a "wrongful act" occurring prior to the policy period.  The improper conduct, errors, omissions, or breaches of duty occurring prior to the

---

[5] The parallel actions in the series with "act,"—"error, omission or breach of duty" apply under the facts of this case, so it is unnecessary for the court to delve into exactly what type of mistake or improper conduct is required to be an "act."  It is enough to determine that the definition is not so broad as to encompass everyday acts of rendering legal advice and instead requires some misdeed.

policy period include Wooten not keeping his client informed, not providing adequate discovery responses, and not signing the discovery responses under oath.  Under Texas law, "[w]hen an exclusion precludes coverage for injuries 'arising out of' described conduct, the exclusion is given a broad, general, and comprehensive interpretation.  A claim need only bear an incidental relationship to the described conduct for the exclusion to apply." *Scottsdale Ins. Co. v. Tex. Sec. Concepts & Investigation*, 173 F.3d 941, 943 (5th Cir. 1999) (citing *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998)).  "The words are 'understood to mean "originating from," "having its origin in," "growing out of," or "flowing from."'" *Am. States Ins. Co.*, 133 F.3d at 370.

Given this broad interpretation of the term "arising under," it is almost ludicrous to suggest that the claim did not "arise out of" Wooten's pre-inception errors, omissions, or breaches of duty. While there is a question of whether Wooten thought he corrected his discovery blunders and perhaps did not believe he needed to tell his client about it, the claim clearly bears at least an "incidental relationship" to Wooten's conduct prior to the policy period.  Whether Wooten thought he had fixed the problems, and whether a reasonable attorney would have believed it was a non-issue, after the February 2007 motion was filed detailing the problems with Wooten's responses and Wooten did not attempt to correct the clear deficiencies prior to the hearing on and entry of the sanctions order, a claim arose, and its roots were certainly sprouting prior to the inception of the first policy even if they had not yet taken hold.  Thus, upon consideration of the plain language of the exclusion itself, the broad definition of "arising out of," and the undisputed facts, the claim is excluded.

### D.    Other Terms in Policy

DISH and the Welch Litigants argue, however, that the court should find the prior knowledge exclusion ambiguous because (1) it is in conflict with the terms of the application, which are

16

incorporated into the terms of the policy; and (2) when the prior knowledge exclusion is considered in conjunction with the application, it creates an unintended gap in coverage.  Dkt. 238-1.  The agreement between OneBeacon and the Welch Firm consists of the policy, the declarations, and the application and its attachments.  Dkt. 238-4 (declarations).  Under Texas law, conflicts between an application and an insurance policy are resolved in favor of the insured.  *See, e.g.*, *Robbins v. Reliance Ins. Co.*, 102 S.W.3d 739, 748 (Tex. App.—Corpus Christi 2001), *judgment but not opinion withdrawn*, 2003 WL 1847115 (Tex. App.—Corpus Christi 2003) ("Where there is a direct conflict between clauses in the policy, or between the application and the policy, the provisions more favorable to the insured will control."); *Ind. & O. Live Stock Ins. Co. v. Keiningham*, 161 S.W. 384, 386 (Tex. Civ. App.—Dallas 1913, *writ ref'd*) (construing policy in favor of insured when the policy indicated that a horse would be insured only while in the United States and the application did not contain that restriction).

### 1.    Application and Exclusion Terms

First, the Welch Litigants and DISH argue that an inconsistency stems from the prior knowledge exclusion disclosure in the 2007 application compared with the prior knowledge exclusion contained in the 2007 policy.  Dkt. 238-1 at 20.  The application requires the insurer to respond whether any employees of the firm were "aware of any fact, circumstance, or situation which might reasonably be expected to give rise to a claim."  Dkt. 238-12 at 5.  As discussed above, the prior knowledge exclusion excludes coverage if a claim is incidentally related to any wrongful acts occurring prior to the inception of the policy even if the insured had no reason to expect that the acts may result in a claim or lawsuit.  According to the Welch Litigants and DISH, these are entirely different disclosure requirements, making the agreement ambiguous.  The Welch Litigants and DISH further argue that in determining whether a contract is ambiguous, the court must look at the

circumstances under which the contract was entered, which would require the court to also consider the 2006 application, which specifically set forth a prior-knowledge exclusion stating that coverage would be excluded only for acts that "could reasonably be expected to result in a claim."[6]  Dkt. 238-13 (2006 application).

If the "provisions of a contract appear to conflict, we should attempt to harmonize the two provisions." *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 345 (Tex. App.—Dallas 2004, pet. denied).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 346 (citing *Columbia Gas Transmission Corp. v. New Ulm Gas., Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).  "A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. . . . On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589 (citations omitted).

Here, there is no reason that the 2007 application and policy cannot be harmonized, even taking in the context of the narrow exclusion discussed in the 2006 application**.**  While in 2006 the Welch Firm may have been justified in expecting only claims that resulted from acts the Welch Firm reasonably expected to result in a claim to be excluded, since the Westport application the Welch

---

[6]  The 2006 application is different than the 2007 application because it was completed for Westport Insurance Corporation, and the Welch Firm used this application, along with a letter signed by Welch in which he stated that "after inquiry of all officers and managers, [the Welch Firm was] not aware of any claims against the Insured or circumstances, Incidents, disputes or fee problems that may give rise to a claim against the Insured, other than those disclosed in the application," to obtain its first OneBeacon policy.  Dkt. 238-14 (letter from T. Wade Welch to Dean & Draper Insurance Agency (Dec. 20, 2006)).

Firm completed specifically contained the text of the narrower prior knowledge exclusion, in 2007 the Welch Firm completed a OneBeacon application, which did not contain the text of an exclusion, and the Welch Firm was charged with knowledge of what the OneBeacon policy said. *See, e.g.*, *Coachmen Indus., Inc. v. Willis of Ill., Inc.*, 565 F. Supp. 2d 755, 768 (S.D. Tex. 2008) (collecting cases) (noting that the insured had a duty to read the policy and was charged with knowledge of its conditions and coverage). The plain language of the policy does not require the insured to have reasonably expected the pre-inception wrongful act to result in a claim for the exclusion to apply if the insured had a "reasonable basis to believe" it had "committed a wrongful act, violated a disciplinary rule, or engaged in professional misconduct." *See* Dkt. 238-4 at 11. The 2007 application merely asks whether the insured is "aware of any fact, circumstance, or situation which might reasonably be expected to give rise to a claim" and requires an application supplement if so. Dkt. 238-12 at 5. This essentially sets forth a disclosure requirement, which the insurer can use to evaluate whether to issue a policy and use to evaluate costs. It is not irreconcilable with the exclusion, which for all purposes requires the Welch Firm to report any "wrongful acts" it knew of if it wanted to be covered for future claims arising out of the acts, even if it did not at that time believe that a claim would result. Is this practical? Probably not. But it is clearly what the policy says, and it is not in conflict with the requirement to supplement the application should the insured expect that any of these facts, circumstances, or situations may give rise to a claim.

## 2.     Unintended Gap in Coverage

The Welch Litigants and DISH's second argument is more availing. Under the policy and declarations, Welch purchased insurance for claims made during the policy period of December 20, 2007 through December 20, 2008 and retroactive coverage from January 4, 1995. *Id.* The policy purports to cover damages in excess of the deductible and up to the policy limits provided that the

damages "are caused by a **wrongful act** which takes place before or during the **policy period** and after the retroactive date shown on the Declarations."  Dkt. 238-4 at 2.  However, if one were to interpret the prior knowledge provision in accordance with its plain language, the retroactive coverage would be illusory because no "wrongful act" that the attorney was aware of, but did not think would result in a claim, would be covered.  These claims also would not be covered by a prior insurer, since the Welch Firm was only required under the application to report known claims, suits, or incidents, acts, or omissions "that may in the future give rise to a claim or suit" to its former insurer.  *See* Dkt. 238-12 at 5 (2007 application).  Thus, the insurer's construction creates an unintended gap in coverage.

If an insurer's interpretation of a policy would render coverage illusory, then, under Texas law, the court must adopt the insured's reasonable interpretation.  *See ATOFINA Petrochemicals, Inc. v. Continental Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005) (per curium) (accepting the insured's interpretation because the insurer's interpretation "that the exclusion bars all coverage when any negligence on the part of the premises owner is pleaded . . . would render coverage under the endorsement largely illusory"); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997) (refusing to adopt the insurer's construction of the term "accident" because it "would render insurance coverage illusory for many of the things for which insureds commonly purchase insurance").  The Welch Litigants urge the court the read the exclusion in conjunction with the required disclosures in the 2007 policy and determine that the exclusion applies only to a claim arising out of a wrongful act if the insured could reasonably foresee it would result in a claim.  *See* Dkt. 238-1 at 23.  The court finds this construction reasonable in light of the circumstances present when the parties entered into the insurance contract.  Thus, the court will consider the claim to be

excluded only if it arose out a wrongful act that may have reasonably been expected to give rise to a claim.

When analyzing whether prior knowledge exclusions that exclude reasonably foreseeable claims apply, Texas courts generally consider the policy language when determining whether to apply an objective or subjective standard.  In *Westport Insurance Corp. v. Atchley*, *Russell, Waldrop & Hlavinka, L.L.P.* and *Westport Insurance Corp. v. Cotten Schmidt, LLP*, the federal district courts for the Eastern District of Texas and Northern District of Texas considered a prior knowledge exclusion that excluded "any act, error, omission, circumstance . . . occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission [or] circumstance . . . might be the basis of a CLAIM."  *Cotten*, 605 F. Supp. 2d 796, 803 (N.D. Tex. 2009)*; Atchley*, 267 F. Supp. 2d 601, 607 (E.D. Tex. 2003).  Both courts required "an analysis of what an objectively reasonable attorney would expect given the subjective knowledge of the particular attorney involved."  *Cotten*, 605 F. Supp. 2d at 805 (discussing *Atchley*).  In *Darwin Select Insurance Co. v. Laminack, Pirtle & Martines, L.L.P.*, the federal district court in the Southern District of Texas (Judge Atlas), considered a policy that allowed for "coverage for conduct prior to the inception date only if, prior to the inception date, no Insured "had ***any basis***" to foresee that the prior conduct "might ***reasonably be*** expected" to be the subject of a malpractice claim."  *Darwin Select*, No. H-10-5200, 2012 WL 423380, at *3 (S.D. Tex. Feb. 8, 2012).  Judge Atlas determined that, based on this language, "the foreseeability determination should be made on an objective basis."  *Id.*

Here, the language of the application requires the insured to report to its previous insurer "any . . . incident, act, or omission that may in the future give rise to a claim or suit."  Dkt. 238-12. It also requires the insured to disclose whether the person completing the application "or any

members or employees of your firm [are] aware of any fact, circumstance, or situation which might reasonably be expected to give rise to a claim." *Id.* The court finds that the appropriate standard, given this language and in light of the other provisions of the policy, is the standard discussed in *Atchley* and *Cotten*—what an objectively reasonably attorney would expect given the subjective knowledge of the particular attorney involved.

Both parties contend that, under this construction, the court should grant summary judgment in that party's favor. DISH and the Welch Litigants contend that neither Wooten nor a reasonable attorney could reasonably foresee that a claim would be made based on Wooten's pre-inception acts. Dkt. 238-1. OneBeacon contends that any attorney who had commits a wrongful act should expect a claim. Dkt. 246. It asserts that "[t]hough Wooten may have hoped that he would be able to comply with the court's order, he certainly knew that *extreme* consequences would result if he failed to do so; and by August 2006," when Golub sent Wooten an email threatening to "seek appropriate relief" if he did not comply with the court's discovery order, Wooten "knew that opposing counsel believed he was not complying with the court's order." *Id.* at 247 (OneBeacon's brief); Dkt. 246-8 (Golub's email to Wooten).

The court agrees with neither OneBeacon nor DISH and the Welch Litigants. Golub's one-sentence email likely should have caused Wooten or any reasonable attorney to be concerned about a claim since Golub had implied he would seek entry of the sanction order if Wooten did not correct any deficiencies. *See* Dkt. 246-8. Certainly, having that sanction order hanging over one's head would cause any attorney to be concerned. However, Wooten produced an additional 500 or so pages on September 5, 2006. Dkt. 246-5 at 130–31 (Golub Dep.). Golub did not advise Wooten that this supplemental production failed to correct any deficiencies; in fact, it appears the first time Wooten learned that Golub still found his discovery responses to be inadequate is when Golub filed

the February 2007 motion.  *See id.*  It is thus possible that Wooten believed, as of the inception date

of the first OneBeacon policy in 2006, that he had corrected the discovery issues.  The question is

whether a reasonable attorney, given Wooten's knowledge at the time, would have expected

Wooten's acts, errors, or omissions to give rise to a claim.  Golub testified that he, as opposing

counsel, did not believe as of December 2006 or January 2007 "that the sanctions order that was

ultimately entered in July 2007 was a possibility."  *Id.* at 141–42.  While the court does not think

Golub's testimony proves that the claim was not reasonably foreseeable in December 2006, given

the gravity of Wooten's pre-inception errors and the threat of sanction order, the court also does not

think that it was clearly foreseeable that the errors and omissions would give rise to a claim.

Whether a claim was foreseeable is thus a question of fact appropriate for the jury.  Accordingly,

both motions for partial summary judgment, as they relate to this issue, are DENIED.[7]

## IV. CONCLUSION

DISH and the Welch Litigants' motion for partial summary judgment to the fourth cause of

action in OneBeacon's amended complaint (Dkt. 238) is DENIED.  OneBeacon's motion for

summary judgment (Dkt. 237), as it relates to its fourth cause of action only, is also DENIED.  DISH

and the Welch Litigants request for an oral argument is DENIED.

Signed at Houston, Texas on June 24, 2014.

_____
Gray H. Miller
United States District Judge

---

[7]  OneBeacon also argues that even if DISH's claim did not arise from Wooten's pre-inception conduct, the conditions section of the policy requires the court to relate any post-inception conduct that caused the claim back to the date of the first wrongful act in a series of wrongful acts. The court does not find it necessary to reach this argument, as it has not ruled that the claim arose from only post-inception acts.